

**SIGNED this 04 day of October, 2006.**

_____
**R. Thomas Stinnett**
**UNITED STATES BANKRUPTCY JUDGE**

_____


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | |
|---|---|
| In re: | No. 02-13543 |
| | Chapter 13 |
| JAMES EDWARD PYOTT | |
| BONNIE LEE PYOTT, | |
| Debtors, | |
| JAMES EDWARD PYOTT | |
| BONNIE LEE PYOTT, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 06-1075 |
| FAIRBANKS CAPITOL CORP., and | |
| SELECT PORTFOLIO SERVICING, INC., | |
| Defendants. | |

Appearances:   Richard L. Banks, Richard Banks & Associates, P.C., for the Plaintiffs, James Edward Pyott and Bonnie Lee Pyott

Timothy F. Frost, Wilson & Associates, PLLC, for the Defendants, Fairbanks Capitol Corp. and Select Portfolio Servicing, Inc.

R. Thomas Stinnett, United States Bankruptcy Judge

1

**MEMORANDUM**

The chapter 13 debtors brought this action against Fairbanks Capital and Select Portfolio Services for violation of the automatic stay imposed by § 362(a) of the bankruptcy code. 11 U.S.C. § 362(a). The complaint asks that the defendants be held in contempt and also that they be held liable for damages on the ground that the stay violation was willful. 11 U.S.C. § 362(h).  This memorandum deals with the motion to dismiss filed by Select Portfolio Services (SPS).

The allegations of the complaint are summarized below:

> When the debtors filed their chapter 13 case, Fairbanks Capital was a creditor secured by a second mortgage on the debtors' real property. Fairbanks Capital was included in the schedule of secured creditors and was sent notice of the debtors' chapter 13 case. Fairbanks Capital filed a proof of claim of $15,624.77 plus an arrearage of $2,855.22.
>
> The court confirmed the debtors' chapter 13 plan. The confirmed plan provided that Fairbanks Capital would be paid the net amount of its claim with interest at the rate of 10%. The plan also provided that the mortgage would be released upon the debtors' completion of the plan.
>
> The debtor objected to the claim of Fairbanks Capital, and as a result, the court disallowed a portion of the claim amounting to six arrearage payments. This reduced the claim from $15,624.77 to $13,893.05.
>
> The chapter 13 trustee distributed $13,893.05 to Fairbanks Capital plus $3,769.64 interest.  The trustee made the final payment in January 2006.
>
> After the final payment, the debtors inquired about re-financing their first mortgage and discovered that the second mortgage had passed from Fairbanks Capital to Select Portfolio Services (SPS). In late April 2006 the debtors received a letter from SPS showing a principal balance of $5,522.62.
>
> The automatic stay imposed by § 362 of the bankruptcy code enjoined Fairbanks Capital and its successor, SPS, from attempting to collect from the debtors by any means other than filing a proof of claim and receiving payments under the plan.

2

>Sending the debtors the letter showing a principal balance still owed on the mortgage debt amounted to an attempt to collect the balance outside the plan and in violation of the automatic stay. Furthermore, the violation of the automatic stay was willful, and as a result, the debtors are entitled to collect damages from SPS and Fairbanks Capital.

The proof of claim filed by SPS does not include the promissory note, but the letter from SPS gives some basic information. The original principal balance was $17,497.83. The installment payments of principal and interest were $288.62 per month. The loan origination date was May 19, 1998, and the loan maturity date was July 2006. The court assumes the loan maturity date means the last installment payment was due in July 2006. The amount and number of installment payments are mathematically consistent with amortizing the original principal balance at an interest rate of 11% to 12%. If the amount financed was more than the original principal balance, the figures are still consistent though the interest rate would be lower.

The proof of claim filed by Fairbanks Capital includes an arrearage of $2,855.22. The largest part of the arrearage – $1,731.72 – was made up of six missed installment payments for December 2004 through May 2005 ($288.62 X 6). The other large part of the arrearage was a charge of $1,073.65 for foreclosure fees and cost. The remaining $49.85 was made up of two small charges. The debtor objected to the inclusion of the six missed installment payments in the claim, and the court sustained the objection.

SPS argues the complaint should be dismissed under Rule 12(b). SPS apparently means Rule 12(b)(6). It allows the court to dismiss a complaint that fails to state a claim upon which relief can be granted. Fed. R. Bankr. P. 7012(b); Fed. R. Civ. P. 12(b)(6). For purposes of ruling on the motion, the court accepts as true the facts alleged in the complaint and the reasonable inferences from those facts. The court views the allegations of the complaint in the light most favorable to the plaintiff. The court can dismiss a complaint for failure to state a claim only if the plaintiff cannot prove any set of facts to justify a remedy against the defendant. *United Food and Commercial Workers International Union Local 199 v. United Food and Commercial Workers International Union*, 301 F.3d 468 (6th Cir. 2002).

The court can infer from the complaint's allegations that SPS sent the letter to the debtors as a response to their request for information while they were attempting to refinance the first mortgage on the property. The briefs filed by SPS and the debtors agree with this inference. The letter itself states that it is a response to an inquiry by the debtors. The court will treat the complaint as alleging that SPS sent the letter in response to the debtors' request for information while they were attempting to refinance the first mortgage.

SPS contends the letter did not violate the automatic stay because it did not expressly request payment of the amount stated in the letter. The debtors contend the letter had the same effect as a request for payment. The debtors' argument seems to be: (1) SPS knew the debtors wanted the statement to use in their attempt to refinance the first mortgage; (2) SPS knew the refinancing could not be done if the letter showed a balance due; (3) it follows that SPS knew the letter would pressure the debtors to pay the purported balance due so that they could complete the refinancing. The debtors also argue that the letter from SPS actually prevented them from obtaining refinancing. The debtors obviously wanted a statement from SPS showing that the second mortgage debt had been paid in full because they had completed the plan payments on the debt.

SPS responds with the argument that the letter was essentially correct. The debtors' chapter 13 plan requires release of the second mortgage when the debtors complete the chapter 13 plan. The debtors did not complete the plan before receiving the letter or even before filing this lawsuit. As a result, the second mortgage still applied to the debtors' property when they received the letter. For the letter to be correct, however, there must have been a debt for the mortgage to secure. The next question, then, is whether there was a debt to be secured by the mortgage at the time the debtors received the letter.

The debtors contend the mortgage could not have secured any debt because they had completed plan payments on the claim. The court disagrees. The debtors might still have owed a debt under the contract (the mortgage and promissory note), as explained below.

4

Chapter 13 provides more than one method for a plan to deal with a secured debt. Section 1325(a)(5)(B) is the provision generally used for dealing with a secured claim when the debtor wants to keep the collateral. 11 U.S.C. § 1325(a)(5)(B). To comply § 1325(a)(5)(B), the chapter 13 plan must provide that the secured creditor will retain its lien and will be paid its "allowed secured claim" plus interest. The amount of the allowed secured claim depends on the value of the collateral. 11 U.S.C. § 506. When the debtor completes the plan, the secured creditor has a duty to release the lien. *In re Parker*, 285 B.R. 394 (Bankr. E. D. Tenn. 2002) *but see In re Leonard*, 307 B.R. 611 (Bankr. E. D. Tenn. 2004); *see generally* 2 Keith M. Lundin, *Chapter 13 Bankruptcy* § 104.2 at 104-8–104-20 (3rd ed. 2006). Thus, the statutes allow a chapter 13 plan to remake the debtor's deal with the secured creditor. The debtor can require the creditor to release its lien in return for payment of the value of the collateral or the amount of the debt – *whichever is less* – plus interest. *Metrobank v. Trimble (In re Trimble)*, 50 F.3d 530 (8th Cir. 1995); 2 Keith M. Lundin, *Chapter 13 Bankruptcy* § 105.1 (3rd ed. 2006).

The debtors' plan provides for payment of the principal balance of the debt plus 10% interest. The debtors objected to inclusion of the missed installment payments in the claim because the plan dealt with the debt under § 1325(a)(5)(B); the plan did not provide for curing the arrearage (making up the missed installment payments) and continuing the regular installment payments. 11 U.S.C. §§ 1322(b)(2) & 1325(a)(5).[1] Furthermore, the principal balance should have taken into account the six missed installment payments; it should have been larger because the debtors had missed the payments. In summary, the plan treats the principal balance of the debt as the allowed secured claim and provides for payment of that amount with 10% interest.

When a plan deals with a secured debt under § 1325(a)(5)(B), the plan payments generally are not aimed at paying the full amount of the debt as calculated under the contract between the debtor and the creditor. Furthermore, the secured creditor knows the debtor may fail to carry out the plan. The result is that during the debtor's performance of the chapter 13 plan, the secured creditor may keep two

---

[1] The second mortgage was probably not protected by § 1322(b)(2) because the last installment payment would have come due during the plan. 11 U.S.C. § 1322(c). In any event, confirmation decided the issue in favor of the debtors. *In re Grammar*, 310 B.R. 423 (Bankr. E. D. Ark. 2004).

5

records of the what the debtor owes – a plan accounting and a contract accounting. The plan accounting keeps track of whether the debtor is making the payments required by the chapter 13 plan. The contract accounting takes the plan payments into account but calculates the amount due in accordance with the terms of the contract. The creditor may need the contract accounting to determine the amount of discharged debt for tax and other business purposes. The contract accounting should also tell the creditor the amount that will be owed by the debtor *if* the debtor fails to complete the plan. *Heath v. General Motors Acceptance Corp. (In re Heath)*, 305 B.R. 249 (Bankr. N. D. Miss. 2004).

After the debtors finished the plan payments, the contract accounting may have showed that they still owed a debt, the contract balance. Fairbanks Capital and SPS could not have violated the automatic stay simply by keeping the contract accounting during the debtors' performance of the chapter 13 plan. *Kerney v. Capital One Financial Corp. (In re Sims)*, 278 B.R. 457 (Bankr. E. D. Tenn. 2002); *Manner v. Chase Manhattan Mortgage Corp.*, 316 F.3d 1 (1st cir. 2003). Assuming the amount stated in the letter was the contract balance, did the letter violate the automatic stay?

The contract balance was subject to becoming forever unsecured if the debtors completed the plan and obtained a release of the second mortgage. On the other hand, if the debtors failed to complete the plan and obtain a release of the mortgage, then the mortgage would continue to secure some or all of the contract balance. *In re Moore*, 307 B.R. 394 (Bankr. S. D. N. Y. 2004). When SPS sent the letter, the second mortgage was moribund but not dead *if* there was a contract balance still owed.

The potential lender in the debtors' proposed refinancing needed to know whether there was a contract balance – whether the debtors would owe a debt still secured by the second mortgage *if* they failed to complete the plan and obtain a release of the second mortgage. The letter from SPS said there was such a debt. The potential lender was justified in treating the amount stated in the letter as still secured by the second mortgage. Of course, this meant the potential lender was not likely to refinance the first mortgage unless it could make sure that its mortgage would have priority over the second mortgage.

6

Up to this point, the court has assumed the letter stated the contract balance still owed after completion of plan payments on the claim. On the basis of this assumption, the court can say that the letter from SPS did not violate the automatic stay; it accurately revealed to the potential lender the effect of the second mortgage until the debtors completed the plan and obtained a release.

The court may be wrong, however, to assume that the letter states the contract balance. The complaint, the exhibits, and undisputed evidence from the case file suggest a different explanation of the amount stated in the letter. The plan provided for the debt under § 1325(a)(5)(B) instead of under the contract, but the plan payments still may have paid the debt in full or almost in full as calculated under the contract. In other words, after the debtors completed the plan payments, there may not have been a contract balance, or it may have been very small. In this regard, the court has compared the amount actually paid under the plan to the amount the debtors would have paid if they had cured the arrearage and continued making the monthly payments until the second mortgage was paid off in July 2006 during the debtors' performance of the plan.

The plan payments totaled $17,622.69. The principal paid under the plan included the arrearage claim minus the missed installment payments ($2,855.22 – $1,731.72=$1,123.50). The plan payments were completed in January 2006, six months before the last installment payment was due under the mortgage. The early repayment of the principal could have decreased the amount needed to pay the mortgage debt in full as calculated under the contract.

Suppose the plan had provided for curing the entire arrearage, including the missed installment payments, and completing the installment payments for June 2002 through July 2006 ($288.62 X 50). The debtors would have paid less to free the property from the mortgage, a total $17,286.22. The debtors would have been required to pay more than this if they had paid interest on the arrearage, but it should not have been much more. 11 U.S.C. § 1325(e). The amount needed to cure the

arrearage and complete the installment payments should have been about the same as the amount actually paid under the plan.[2]

Of course, the contract accounting might have included additional fees, charges, or interest because the plan payments did not follow the contract schedule. The court doubts that they would have totaled as much as the amount stated in the letter, about $5,500. Furthermore, the letter states that no payments were more than 15 days late within the preceding twelve months. This seems to disagree with the conjecture that the amount due, as stated in the letter, includes a large amount of fees, charges, or interest due under the contract because the plan payments did not follow the contract schedule.

In summary, the facts imply that when SPS sent the letter, the debtors should have owed nothing or very little on the second mortgage debt even under the contract accounting. Why, then, did the letter from SPS show a balance of about $5,500?

The letter includes a hint that SPS calculated the amount due as of the wrong date. The final plan payment on the second mortgage debt was a check for $5,911.50 issued by the chapter 13 trustee on December 31, 2005. The letter from SPS is dated April 24, 2006, but it states the "Next Payment Due Date" as December 19, 2005. This suggests the letter stated a balance due of about $5,500 in December 2005 before the final plan payment of about $5,900. If this is true, then the letter probably should have shown that the debt had been paid in full even as measured by the contract.

This brings the court to the crux of the problem. When the debtors received the letter, they may or may not have owed a debt as calculated under the contract.[3] If the debtors owed nothing, could the letter have violated the automatic stay? Yes. The letter would have hindered the debtors' ability to deal with the property before they completed the plan and obtained a release of the second mortgage without a good legal reason for doing so. The letter might be treated as a violation of the automatic stay

---

[2] By using § 1325(a)(5)(B), the debtors avoided making the regular installment payments from the beginning of the plan. The payments on the debt began in the seventh month of the plan and varied from slightly less than $200 to slightly more than $5,900.

[3] The court will ignore the possibility that the contract accounting showed an amount still due that was different from the amount stated in the letter. The parties have not argued that possibility.

8

because it was an unlawful method of controlling property of the bankruptcy estate. 11 U.S.C. § 362(a)(3).[4]

Arguably, the letter could have violated the stay without regard to whether SPS accidentally miscalculated or knowingly asserted a false debt.[5] In either case, the letter still would have interfered with the debtors' ability to deal with the property. As a general rule, the effect of the creditor's action determines whether it violated the automatic stay. The creditor's intent is relevant primarily in determining the appropriate remedy, especially whether it is liable for damages for having willfully violated the stay. 11 U.S.C. § 362(h); *Toti v. United States*, 141 B.R. 126 (Bankr. E. D. Mich. 1992), *rev'd on other grounds*, 149 B.R. 829 (E. D. Mich. 1993), *aff'd* 24 F.3d 806 (6th Cir. 1994), *cert. den.*, 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994).[6] Thus, the letter from SPS could have violated the automatic stay if it showed an amount still due when the debtors did not owe anything under either the plan *or the contract*.

The complaint fails to allege or even imply full payment under the contract. The complaint relies entirely on the incorrect argument that since the debtors had completed the plan payments, then SPS was required to show that the debt had been paid in full. On the other hand, SPS's motion assumes the debtors still owed a debt under the contract, and as a result, the letter did not violate the stay. The court is not required to accept this assumption as true simply because the complaint did not allege the opposite. The question comes down to whether the court should dismiss the complaint because it does not allege that the debt, as calculated under the contract, was paid in full before the letter was sent. The court thinks not. The complaint does not allege it, and the debtors have not argued it, but the exhibits to the complaint and undisputed facts from the case file suggest that before the letter was sent the debt had

---

[4] The plan provides that confirmation does not divest property from the bankruptcy estate. 11 U.S.C. § 1327(b). Actions allowed by the system do not violate the stay even if wrong, such as filing a false proof of claim. *In re Sims*, 278 B.R. 457 (Bankr. E. D. Tenn. 2002); *In re Sammons*, 253 B.R. 672 (Bankr. D. S. C. 2000). That reasoning does not apply to the debtors' complaint.

[5] A stay violation is more obvious when a creditor knowingly asserts a fictitious secured debt. Why would the creditor do it, if not to unfairly restrict the debtors' ability to deal with the property?

[6] The courts must interpret or characterize the creditor's action, especially a communication, in light of the automatic stay. What was the effect of the action, reasonably interpreted? This might be referred to as deciding whether the creditor intended to violate the automatic stay. *See Citizens Bank of Maryland v. Stumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995).

been paid in full under the contract. In this situation, the court will not dismiss the complaint but will order the debtors to file a more definite statement.